## Linda A. Weaver, David P. Weaver and Liberty Mutual Insurance Co. v. Georg Karl Geka Brush, GmbH and Otto Schell

[689 A.2d 439]

No. 94-444

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 20, 1996

*Thomas W. Costello, John C. Mabie* and *Joel T. Faxon* of *Costello & Mabie,* and *Jesse M. Corum, IV,* of *Gale, Corum & Stern,* Brattleboro, for Plaintiffs-Appellants Linda and David Weaver.

*Robert P. Gerety, Jr.,* White River Junction, for Plaintiff-Appellee Liberty Mutual Insurance Co.

*Joseph C. Galanes* of *Kristensen, Cummings, Phillips, Carroll & Melendy, P.C.,* Brattleboro, for Defendant-Appellee.

**Dooley, J.** Plaintiffs Linda and David Weaver brought a personal injury suit against defendant Georg Karl Geka Brush, GmbH, a German corporation, and its employee Otto Schell,* claiming that Linda Weaver was injured as a result of Schell's design of a machine and Georg Karl Geka Brush, GmbH, was vicariously liable. Plaintiffs also attempted to join Liberty Mutual Insurance Company as a party plaintiff alleging that it was a real party in interest because it had made workers' compensation payments to Linda Weaver and claimed a lien on any recovery. The jury found that defendant was not negligent. On appeal, plaintiffs raise three arguments: (1) the trial court erred in failing to grant their motion for judgment notwithstanding the verdict (j.n.o.v.) because defendant Georg Karl Geka Brush, GmbH failed to show that Otto Schell had become the borrowed servant of Geka Brush Manufacturing Corporation, its local subsidiary; (2) the jury charge on the borrowed-servant doctrine was misleading and prejudicial; and (3) Liberty Mutual Insurance Company is a real party in interest and should have been joined in the litigation. We affirm.

On August 30, 1989, plaintiff suffered an injury while operating a disposable brush-welding machine at the Geka Brush Manufacturing Corporation (Geka Vermont) plant in Brattleboro, Vermont. Because of a jam in the machine, plaintiff was required to access a feeder bowl, which was above her head. To do so, she was supplied with a milk crate positioned next to the machine. She fell off the milk crate and suffered a sprained ankle. Her medical evidence was that as a result of the fall, she now suffers from permanent lower back injuries.

Geka Vermont is a Vermont corporation that manufactures component parts for the cosmetics industry and is a wholly owned subsidiary of Geka Corporation, a Delaware corporation. Geka Corporation is, in turn, wholly owned by Georg Karl Geka Brush, GmbH, a German limited liability corporation (Geka Germany).

It was the practice of Geka Germany to send its employees to its subsidiary corporations. Geka Vermont requested that Geka Germany send one of its employees to conduct training sessions, assist in the operation of the mascara dispensing machines, and to make any necessary repairs to the machines. Geka Germany complied with Geka Vermont's request, and sent Otto Schell, a mechanical engineer, to the Vermont plant. It was standard practice for the subsidiary

---

* Apparently, the complaint was never served on Otto Schell. The case proceeded solely against Georg Karl Geka Brush, GmbH.

corporations to reimburse the parent corporation for the services of the employee although the employee remained on the payroll of the parent corporation. This arrangement was used for Otto Schell.

At the Vermont plant, without informing or seeking the consent of Geka Germany, the president of Geka Vermont asked Schell to design and construct a new mascara dispensing machine to fill a special order. Schell agreed to do the job and went ahead and designed and built the machine. No one at Geka Germany had any knowledge of the agreement between Schell and Geka Vermont. In fact, to design and build the machine, Schell stayed with Geka Vermont longer than originally planned. Geka Germany did not approve of Schell's extended stay in Vermont.

Plaintiffs brought a personal injury suit against Geka Germany, contending that Schell's negligent construction of the machine was the proximate cause of Linda Weaver's injury. Plaintiffs argued that Geka Germany, as Schell's employer, was vicariously liable for her injuries.

In December 1994, the matter was tried before a jury. Geka Germany denied any liability on its part, arguing that although Schell was its employee, he had become the borrowed servant of Geka Vermont. Defendant also argued that Schell was not negligent in designing and constructing the machine, and that any negligence was not the proximate cause of plaintiffs' injury. The jury found that defendant Geka Germany was not negligent.

Plaintiffs sought a directed verdict and j.n.o.v. on liability, arguing that Schell was negligent as a matter of law and that he remained the servant of Geka Germany, also as a matter of law. The court denied these motions.

We first address plaintiffs' argument that they should have been granted a directed verdict on liability. Their argument has two steps: Otto Schell was guilty of negligence as a matter of law by designing a machine that relied upon an unsafe milk crate for access to a part of the machine; and defendant was vicariously liable for Schell's negligence because it was his master, Geka Vermont did not become his master, and he was acting within the scope of his employment.

■ In considering a motion for a directed verdict or j.n.o.v., we must evaluate the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence. See *Nadeau v. Imtec, Inc.*, 164 Vt. 471, 475, 670 A.2d 841, 844 (1995); *Lockwood v. Lord*, 163 Vt. 210, 212, 657 A.2d 555, 557 (1994). The grant of the motion would be "improper if there is any evidence that

fairly and reasonably supports the nonmoving party's claim." *Lockwood*, 163 Vt. at 212, 657 A.2d at 557.

■ We do not believe that the evidence meets this standard for either step of plaintiffs' argument. There was evidence that Schell designed the machine with no method of access to the feeder bowl, that Geka Vermont added the milk crate, and that Schell never saw the milk crate in use and never was aware of its use. Negligence is the "failure to exercise care which the circumstances reasonably require or justly demand." *Thurber v. Russ Smith, Inc.*, 128 Vt. 216, 219, 260 A.2d 390, 392 (1969). We cannot say as a matter of law that the absence of a means for a short person, like Linda Weaver, to access the feeder bowl to remove a jam was negligence, or that Schell is responsible for the dangerous condition created by the milk crate added by Geka Vermont.

Nor are we persuaded that as a matter of law Schell was a servant of Geka Germany. As both plaintiffs and defendant have argued, this step in the argument requires us to examine the law of borrowed servants.

We have only one detailed precedent on the applicability of the borrowed-servant doctrine to tort litigation, *Minogue v. Rutland Hosp., Inc.*, 119 Vt. 336, 125 A.2d 796 (1956), in which this Court held that a delivery room nurse had become the borrowed servant of the supervising obstetrician so that the hospital which employed the nurse was not liable for the nurse's negligence. *Id.* at 341-42, 125 A.2d at 800. The Court stated that "the essential test" of whether one is the servant of another "is whether he is subject to the latter's control or right of control with regard not only to the work to be done but also to the manner of performing it." *Id.* at 339, 125 A.2d at 798. Drawing from comment a of § 227 of the Restatement of Agency (1933), the Court noted that the central question is not whether the servant remains the employee of the general employer "as to matters generally, but whether as to the specific transaction in question, he is acting in the business of and under the direction of the one or the other." *Id.* We adopted the test of *Denton v. Yazoo & M.V.R.R.*, 284 U.S. 305 (1932):

> "Where one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former. . . . We must carefully distin-

guish between authoritative direction and control or mere suggestion as to details or the necessary cooperation when the work presented is part of a larger undertaking."

*Minogue*, 119 Vt. at 339, 125 A.2d at 799 (quoting *Denton*, 284 U.S. at 308-09).

Plaintiffs urge that we now adopt the rule stated in § 227 of the Restatement (Second) of Agency (1958). On its face, § 227 adds little to the discussion in *Minogue*. It provides only that a "servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services." Restatement (Second) of Agency § 227 (1958).

Plaintiffs emphasize the discussion in the comments to § 227, particularly that (1) the borrowed servant must be "subject to the direction of the temporary employer as to the details of such act," *id.* cmt. a; (2) in the absence of evidence to the contrary, there is an "inference that the actor remains in his general employment," *id.* cmt. b; and (3) the fact that the employee has the "skill of a specialist" indicates a "continuance of the general employment," *id.* cmt. c. From these points, plaintiffs argue that because Schell was a highly skilled specialist and the details of his work were not controlled by Geka Vermont, he was not a borrowed servant.

The comments on which plaintiffs rely are entirely consistent with *Minogue*. Although we agree with and adopt the Restatement section, we do not see this as a change in our law. Our task is to apply the law to the facts before us.

■ Ordinarily, the question of whether one is the borrowed servant of another is one of fact, to be determined based upon analysis of a number of factors. See *Continental Ins. Co. v. New Hampshire Ins. Co.*, 422 A.2d 1309, 1311 (N.H. 1980); *Daily Express, Inc. v. Workmen's Comp. Appeal Bd.*, 406 A.2d 600, 601-02 (Pa. Commw. Ct. 1979); see generally Restatement (Second) of Agency § 227 cmt. a (1958). We cannot conclude that the factors present here point only in plaintiffs' direction.

Plaintiffs emphasize that Schell was a highly skilled specialist who worked with little or no supervision of his work. We agree that the skill level of Schell is an important factor, but we do not agree that it is determinative. See, e.g., *A.J. Johnson Paving Co. v. Industrial Comm'n*, 412 N.E.2d 477, 481 (Ill. 1980). The issue is whether Geka Vermont had a right to control the details of his work, and not whether it actually exercised such control. We concur that "the

'control' which the special employer must assume need not extend to directing the technical details of a skilled employee's activity. This would mean that skilled employees would hardly ever be employees under the act. What is essential . . . is the right to control the time and place of the services, the person for whom rendered, and the degree and amount of services." 1B A. Larson, The Law of Workmen's Compensation § 48.30, at 8-544 to 8-545 (1996) (footnote omitted).

Comment c to § 227 of the Restatement notes that "continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist." Restatement (Second) of Agency § 227 cmt. c (1958). The circumstances detailed in the comment do not fit this case. Although Geka Germany might have substituted any mechanical engineer in the beginning of the assignment, the task of designing and building the disposable brush-welding machine was particularly within the competence of Otto Schell. Indeed, the general employer, Geka Germany, was unaware of Schell's work and was in no position to supervise or change it.

Nor do we think the duration of the special assignment was short. The design and construction of the machine took several weeks, and Schell overstayed his initial assignment to complete it.

Overall, we conclude that the question whether Schell had become the borrowed servant of Geka Vermont was for the jury, and the court properly denied the j.n.o.v. motion. In reaching this conclusion, we have considered plaintiffs' argument that there is an inference of continuing control by the general employer. See Restatement (Second) of Agency § 227 cmt. b (1958). Such an inference arises only "[i]n the absence of evidence to the contrary," *id.*, and applies only "so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." *Id.* We believe there is evidence to the contrary. Moreover, the jury could find that Schell had gone beyond the business entrusted to him by Geka Germany.

We next address plaintiffs' arguments concerning the jury instructions. Plaintiffs argue that the trial court erred when it failed to instruct the jury that (1) it must determine who had control over the "means and methods" of Schell's work; (2) under the borrowed-servant doctrine, the employee is presumed to be in the employ of his general employer; and (3) the borrowed-servant doctrine is an affirmative defense.

First, plaintiffs contend that the trial court erred in failing to instruct the jury that the right of control of the special employer must extend to the "means and methods" of employment. Before considering the substance of this objection, we must determine whether it was properly preserved.

Both parties submitted requests to charge. Plaintiffs' requests did not cover the elements of the borrowed-servant doctrine, but plaintiffs' attorney raised it in the charge conference in the following discussion:

> [Plaintiffs' Attorney]: Your honor, I believe the law on this is, and I am thinking of the propane gas case out of Wallingford and other ones, that is the means and methods that the control must be addressed to. The Court remembers those cases where —

> The Court: Okay. You got that case? I'll take a look at it, the means and methods.

> [Plaintiffs' Attorney]: — of performing the function, Lewis versus Vermont Gas. . . . Lewis holds that it is the means and purpose of affecting the end which determines whether it is an employee or not. It has to be control over those means and methods. . . . I don't have at hand that particular cite.

> The Court: You got a submission on that?

> [Plaintiffs' Attorney]: Sorry, I don't.

> . . . .

> The Court: Well, I am going to adopt that, knowing I will, would be glad to take a look at it if you got the case for me. No one submitted a request on this. The rule requires that a request be submitted in writing to the Court. I don't have that. I think, I am not so sure it is different than *Minogue*. I mean, one test of control would be: Who has the means and methods? You are free to argue that.

Despite the invitation from the court, plaintiffs' attorney offered neither a formal submission on "means and methods" nor a memo on the authority supporting it. As a result, the court did not specifically charge on the question.

Following the charge to the jury, plaintiffs' attorney asked whether objections "reserved at the conference" were preserved, and the court answered, "Yes." The attorney went on:

> [Plaintiffs' Attorney]: Particularly, Lewis versus Vermont Gas on the means and methods.

> The Court: I looked at Lewis versus Vermont Gas Corporation, but it doesn't mention that point at all as to master/servant.

> [Plaintiffs' Attorney]: I'm sorry, Your Honor, if I misstated the case.

> The Court: Good on contributory negligence and assumption.

> [Plaintiffs' Attorney]: I'm sorry, Your Honor, wrong case. . . . In any event, we said it on the record before. I don't want to waste the court's time.

■ V.R.C.P. 51(b) provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." As we discuss below, the actual jury instruction covered much of the concept plaintiffs were urging, although not in the precise language plaintiffs were advancing in the charge conference. Plaintiffs failed to address why that language was inadequate. As a result, we cannot find that plaintiffs stated distinctly the matter objected to or the grounds for the objection.

The situation in this case is similar to that in *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 137, 636 A.2d 744, 749 (1993), where we held, as we do here, that a party failed to preserve an objection although the matter had been raised in a charge conference and the court had declared preserved all matters raised in the conference. We held:

> We reiterate that we do not believe that a blanket reference made after the charge to arguments made before the charge, even if allowed by the trial court, complies with Civil Rule 51(b). We certainly do not accept the theory that such a blanket reference can cover another blanket objection to hundreds of pages of difficult-to-follow argument. As it is, we do not read the statement in question as making a blanket reference in this case. Plaintiff failed to object

"distinctly" to the lack of specificity in the consumer fraud charge and to state the grounds of the objection.

*Id.* at 138, 636 A.2d at 750.

Plaintiffs here were more specific in pointing to the "means and methods" issue, but never clearly objected to the court's proposed charge at the charge conference, in large part because the court was still formulating the charge and was open to any specific suggestions made by plaintiffs' counsel. Because there was no objection at the charge conference, there was nothing to preserve from that conference at the post-charge discussion. Plaintiffs failed to follow up, and their post-charge statement was more an apology for failure to specify their position than an objection. In any event, the objection failed to address the inadequacies in the charge actually delivered, and, for that reason, did not comply with Rule 51(b). See *Donahue v. Cowdrey*, 440 S.W.2d 773, 776 (Ark. 1969) (objection to borrowed-servant charge was inadequate because it was not "put in the form of a specific objection to the language selected").

Even if plaintiffs had properly preserved their objection, we are not convinced that the charge actually given was erroneous. The court charged that the jury had to determine "who had the right to control Mr. Schell in the performance of his work at the time in question." It itemized a number of factors relevant to the question, including "who had the right of control over Mr. Schell beyond mere suggestion . . . of details or cooperation?" Following the listing of the factors, the court restated the issue: "The corporation with the authority to control the design, assembly and construction of the disposable machine is solely responsible for any alleged negligence of Otto Schell."

■  In charging the jury, the court is required to include every material point raised by the evidence. See *Lockwood*, 163 Vt. at 217, 657 A.2d at 560. Nevertheless, the court has discretion to select its own language. On appeal, we will conclude that the jury charge was correct if, taken as a whole, the charge breathed the true spirit of the law and did not mislead the jury. *Id.* at 218, 657 A.2d at 560.

■  We do not think the charge misled the jury. As discussed, the factors approach is adopted by the Restatement, and the court detailed most of the Restatement factors. See Restatement (Second) of Agency § 227 cmt. a (1958) (whether borrowed-servant doctrine applies is based on factors in § 220(2)); *id.* § 220(2) (listing factors). The court's summary of the issue, although not using the term

"means and methods," certainly conveyed the concept that the right of control had to involve all aspects of the work. We think this wording was within the court's discretion.

■ We will discuss plaintiffs' other objections to the charge only summarily. Plaintiffs claim that the court should have charged that there is a presumption that the servant remains under the control of the general employer, in this case Geka Germany, and that defendant had the burden of proof. Plaintiffs failed to submit proposed instructions on these issues, and never objected on these grounds at the charge conference or after the charge was delivered. The questions were not preserved, and we will not consider them.

Regarding the third issue, plaintiffs contend that the insurance carrier which paid workers' compensation benefits to Linda Weaver is a real party in interest and the trial court erred in failing to join it in the litigation as a plaintiff. At oral argument, plaintiffs conceded that an affirmance of the jury verdict in favor of defendant would render this issue moot. Thus, because we affirm the jury verdict, we need not address the real-party-in-interest issue.

*Affirmed.*